T.C. Memo. 2018-118

UNITED STATES TAX COURT

WHISTLEBLOWER 7208-17W, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7208-17W.                    Filed July 31, 2018.

<u>Sealed</u>, for petitioner.

<u>Elizabeth Mourges</u>, <u>Kevin Gillin</u>, and <u>Nancy Gilmore</u>, for respondent.

MEMORANDUM OPINION

LEYDEN, <u>Special Trial Judge</u>:  Petitioner brought this action pursuant to

section 7623(b)(4)[1] for the Court to review the Internal Revenue Service (IRS)

_____

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code, as amended, in effect at all relevant times, and all Rule references
are to the Tax Court Rules of Practice and Procedure.  The Court uses male-gender
(continued...)

[*2] Whistleblower Office's (Whistleblower Office) denial of his claims for a whistleblower award. This matter is before the Court on petitioner's motion to proceed anonymously (motion), filed March 30, 2017, pursuant to Rule 345(a). Respondent objects to petitioner's motion. For the reasons stated herein, petitioner has not satisfied his burden of showing that the risk of harm to him outweighs the public's right to know who is using the Court. The Court will deny petitioner's motion.[2]

## Background

I. Petitioner's Careers

Petitioner received a master's degree for which he wrote a thesis on a financial trading strategy (trading strategy) he developed. After graduating in 1991, petitioner worked as a floor trader on Wall Street for about six months. For the next five years petitioner traded remotely from a home office, but he returned

---

[1](...continued)
personal pronouns to refer to petitioner for convenience and without intention to identify petitioner's actual gender.

[2]Nevertheless, the Court has changed the caption of the case to accord petitioner anonymity in case he wishes to appeal the Court's denial of the motion. See Whistleblower 14377-16W v. Commissioner, 148 T.C. __, __ (slip op. at 3 n.2) (June 28, 2017). If within 30 days of the Court's issuing its order denying the motion petitioner does not file with the Clerk of the Court a notice of appeal, the Court will change the caption back to reflect the petition as filed.

[*3] to floor trading in 1997. Sometime in 2000 petitioner became a desk trader at an investment banking, securities, and investment management firm. According to petitioner, he was hired because the senior and managing directors of the firm were very impressed with an executive summary he had written about his trading strategy.

During 2000 American Stock Exchange (AMEX) began an investigation and identified petitioner as a witness in that investigation. Shortly after September 11, 2001, petitioner was laid off from his job as a desk trader. After being laid off, petitioner decided to spend time perfecting his trading strategy to engage private wealth clients.

In 2004 petitioner became a subject of, rather than a witness in, the AMEX investigation and was charged with a fine and penalties for violating exchange rules. Petitioner, as a registered representative, was required to disclose that he was the subject of this investigation each time he filed a Form U4, Uniform Application for Securities Industry Registration or Transfer, with the Financial

**[*4]** Industry Regulatory Authority (FINRA).[3]  This made it difficult for petitioner to obtain employment as a trader.

However, AMEX withdrew the charges within 12 months of filing them, but the charges continued to be reported by FINRA.  Starting in 2005 petitioner acted to get the charges expunged by FINRA.

Sometime in 2008 FINRA removed the charges, after which petitioner began looking for trader positions on Wall Street.  He secured a day-trading position with a firm but left that position in less than 90 days.  He secured another day-trading position but also left that position within 90 days.  He was not able to hold a job for more than a few months.

After working at these two day-trading positions, petitioner decided to start his own fund using his trading strategy.  In 2008 or 2009 petitioner signed an investment advisory agreement with a family office that used petitioner's trading strategy as the sole business strategy for its fund.  According to petitioner, in 2010

---

[3]FINRA is "a quasi-governmental agency responsible for overseeing the securities brokerage industry." McCune v. SEC, 672 F. App'x 865, 866 (10th Cir. 2016) (quoting ACAP Fin., Inc. v. SEC, 783 F.3d 763, 765 (10th Cir. 2015)). FINRA requires any person who works in the investment banking or securities business of a FINRA member firm to register as a securities representative or principal, among other categories. Mathis v. SEC, 671 F.3d 210, 211 (2d Cir. 2012). To register, applicants must complete a Form U4, in which they provide detailed information about their personal, employment, disciplinary, and financial background. Id.

[*5] the trading strategy did so well it "[a]bsolutely knocked the cover off the ball". Petitioner, through the family office, met with a private wealth hedge fund to seek a $50 million investment in his trading strategy. The private wealth hedge fund offered to buy petitioner's trading strategy for $5 million, but petitioner believed it was worth $20 million and declined the offer. Petitioner subsequently parted ways with the family office, citing conflict as one of the reasons for his departure.

After his departure petitioner obtained a management position at a hedge fund. The hedge fund accepted his "full record, which was now audited as exemplary". A partner that managed the technology for the hedge fund promised to help petitioner automate his trading strategy but, according to petitioner, "they actually didn't know as much as" he did. Petitioner was fired from that position after about 13 to 14 months because he "had no desire to work for * * * [a] particular senior partner" and was critical of the hedge fund.

By then petitioner had registered an entity through which he could develop a fund to use his trading strategy (investment entity). Petitioner began efforts to raise $50 million for his investment entity. During that time petitioner engaged a foreign exchange algorithmic trading strategy developer (first service provider), which automated his trading strategy in 12 months.

[*6]   During those 12 months petitioner considered using real estate as another asset class for his trading strategy.  Petitioner, through an intermediary, presented his trading strategy to a potential investor he described as a "subprime billionaire who invests heavily in real estate."  According to petitioner, the potential investor liked his trading strategy but later decided not to invest in it.

In 2014 petitioner engaged another algorithmic trading strategy developer (second service provider) because he wanted to include real estate assets in the automation of his trading strategy, a function the first service provider could not support.  Petitioner's goal was to add real estate to the asset class group in order to seek an investment from a firm that had over $100 billion in assets.  Petitioner met with a principal of the second service provider.  Petitioner disclosed to this principal his status as a whistleblower.  See infra pp. 9-12.  According to petitioner, the principal "felt there was a strong upside to * * * [the] particular [trading] strategy and initially offered to both help with the technology and then also potentially provide introductions [to investors]."  Petitioner's relationship with the second service provider subsequently ended.

In the summer of 2015 petitioner met with another potential investor at a family event.  This potential investor was a longtime friend of petitioner's cousin and a principal at a private equity real estate firm.  Petitioner also disclosed to this

[*7] principal his status as a whistleblower. See infra pp. 12-13. According to petitioner, this principal "runs one of the best * * * funds for real estate in the world" and was willing to talk about a possible investment in petitioner's trading strategy but wanted to hear more about it. The principal ultimately decided not to invest in petitioner's trading strategy.

Unable to find investors for his trading strategy, petitioner deregistered his investment entity and decided to switch careers. He is currently a graduate student pursuing a master's degree in real estate investment to become a real estate consultant and adviser. Petitioner does not have any plans to return to his prior career as a trader or to use his trading strategy in his capacity as a real estate consultant and adviser. Petitioner will not engage in trading or financing real estate as a real estate consultant and adviser.

II.  Petitioner's Awareness of Targets and Information Underlying Whistleblower Claims

Petitioner became aware of the information underlying the whistleblower claims sometime before 2007 when he was solicited as a potential client for an investment promoted by various entities (targets).[4] Initially, petitioner deposited

---

[4]In the motion petitioner asserts that he "obtained much of the information forming [p]etitioner's section 7623(b) claim during the course of [p]etitioner's employment". However, petitioner was never employed by the targets.

[*8] money to purchase an interest in the promoted investment. After conducting further research and due diligence, petitioner concluded that the investment lacked economic substance and was likely fraudulent. Shortly thereafter petitioner withdrew the deposit and did not purchase the promoted investment. Petitioner did not have any other relationship with the targets.

Sometime thereafter petitioner was contacted by the IRS, which was investigating the investment promoted by the targets. The IRS contacted petitioner because it had identified him as someone who had initially made a deposit to purchase the promoted investment but who did not purchase it. Petitioner met with several IRS employees who asked questions aimed at determining how he learned about the promoted investment, why he withdrew the deposit, and why he did not go through with the promoted investment. Petitioner volunteered his opinion that on the basis of his professional background he thought the strategies used in the promoted investment were not appropriate for options or derivatives and that he thought the promoted investment constituted fraud. Petitioner did not, at that time, file a whistleblower claim but did consult with an attorney about doing so. Petitioner was never engaged or called as a witness by the IRS or the Department of Justice in subsequent criminal proceedings against individuals associated with the targets.

**[*9]**    According to petitioner, from 2007 until 2014 he followed public press releases for a criminal proceeding against an individual associated with one of the targets.  In 2014 that individual was convicted and sentenced, after which petitioner decided to file his whistleblower claims with the Whistleblower Office.  On June 25, 2015, petitioner filed a Form 211, Application for Award for Original Information, with the Whistleblower Office to seek an award for the information he had volunteered to the IRS about the targets in 2007.

III.    Petitioner's Disclosures About His Whistleblower Claims

Petitioner disclosed to at least three individuals that he had been contacted by the IRS concerning the investment promoted by the targets and that he was either thinking of filing or had filed whistleblower claims against the targets.

A.    Disclosure to Principal at Second Service Provider

During preliminary conversations with the principal at the second service provider, see supra p. 6, petitioner disclosed his whistleblower status and that his whistleblower claims involved a promoted investment with a foreign exchange product.  His disclosure, however, came before petitioner filed his whistleblower claims with the Whistleblower Office.  When asked why he made the disclosure, petitioner testified that the principal "is notable in the press for having uncovered, mathematically, that the Madoff returns were fraudulent".  Petitioner considered

**[*10]** the principal to be "an upstander in the marketplace" whose "reputation is gold". Petitioner testified that "once you have a golden reputation on Wall Street, everyone can trust you." Petitioner believed that the principal could provide him with guidance on what next steps to take and the best practices for filing a whistleblower claim because petitioner was frustrated that the attorney he had met with about his whistleblower claims was taking too long.

Specifically, petitioner asked whether the principal had any understanding of what expertise would be needed in a case involving the promoted investment "because the principal had written a book and articles on tax structures and tax-efficient strategies." Petitioner did not disclose to the principal the name of the targets at that time. The principal indicated that he did not have the necessary expertise and recommended that petitioner speak to an individual in the foreign exchange area. Petitioner never pursued that recommendation.

Following the disclosure, the second service provider worked with petitioner on how to pitch his trading strategy to potential clients and was willing to have him publicly refer to it as his selective quantitative provider. Petitioner testified that he was "excited that one of the world's best, most renowned quantitative experts was willing to support" his trading strategy.

[*11] The second service provider invited petitioner to some of its academic and client seminars. It was at one of those seminars in the summer of 2015, after he had filed his whistleblower claims with the Whistleblower Office, that petitioner disclosed to the principal the name of one of the targets. Petitioner testified that he was at an informal gathering after the seminar and was talking to his accountant and to the principal. Petitioner was openly discussing his then-filed whistleblower claims with his accountant[5] and mentioned the name of one of the targets. In particular, petitioner was discussing the public news about the various ongoing criminal investigations in which at least one of the targets or persons affiliated with at least one of the targets was involved and a public report that had been issued relating to that target's abusive options strategies. According to petitioner, when the principal heard the target's name he "shushed" petitioner because the target was represented at the seminar. Petitioner inferred that the target was a client of the second service provider but did not confirm that. Petitioner testified that after that conversation, the relationship with the second service provider

---

[5]Petitioner testified that he had disclosed the contents of the whistleblower claims to the accountant sometime in 2014. The record on petitioner's motion does not show the circumstances under which he made the disclosure to his accountant.

[*12] dissipated.  The second service provider did not mention petitioner's whistleblower claims as a reason for not continuing the relationship.

B.    Disclosure to Principal at Private Equity Real Estate Firm

Petitioner also disclosed his whistleblower claims to his cousin's friend, the principal at the private equity real estate firm.  See supra p. 7.  Petitioner testified that before meeting with the principal "my cousins said that they have known * * * [the principal] all their life, and he is as much family as I am, and that they wanted the full disclosure.  And I agreed."[6]  At the meeting with the principal, petitioner discussed the whistleblower claims.  Petitioner testified that he told the principal that the information was "highly confidential".  When asked why he felt the need to disclose the whistleblower claims to the principal, petitioner testified that in part it was due to the principal's being "quietly known as somebody who also prevented a Boston charity in investing in a Madoff fund."  Petitioner further testified that this principal was an "upstander" with "a fantastic reputation."

Petitioner also discussed his trading strategy at that meeting and believed it was one of the best meetings he ever had.  Petitioner testified that the principal said that he was happy to help him with his trading strategy and that the principal

---

[6]The record on the motion does not show the context under which petitioner initially disclosed the details of the whistleblower claims to his cousins.

**[*13]** had a friend at an institution that would be interested in helping petitioner

with it. After that meeting, petitioner sent the principal a full presentation and

information about his trading strategy. Petitioner also sent the principal a copy of

the whistleblower claims that he had filed with the Whistleblower Office.

Petitioner testified that he received one email from the principal but that

there was never any other followup after that. Petitioner supplemented his

declaration in support of his motion with that email, which states:

> Great to meet you as well. Read through all of your information.
> While the parabolic trading concept seems like an interesting way for
> holder of illiquid assets to take advantage of the market vol [sic], it
> really doesn't fit well with anything we do. There must be someone
> out there with the time and attention span to look at it seriously!
> The whistleblower suit--not our kind of thing--is, well, fascinating! I
> don't have any idea of its likelihood of success, but it is one king
> sized bit of optionality!!

C.      Disclosure to CFO of Real Estate Firm

Most recently, as part of a group project as a graduate student, petitioner

met with a chief financial officer (CFO) of a real estate firm. The CFO took

interest in an investment executive summary that petitioner wrote for the group

project. According to petitioner, they developed "a very quick and full disclosure-

type relationship". Petitioner discussed with the CFO his interest in developing

[*14] his trading strategy for real estate and sent the CFO background on his trading strategy.

Petitioner testified that the CFO "loved it", and they discussed forming a partnership in which the CFO would be the managing member. The two exchanged documents and had a lunch meeting, during which petitioner disclosed to the CFO his whistleblower claims. When asked why he made the disclosure, petitioner testified that the CFO intended to seek a direct investment from the CFO's firm as seed capital. Petitioner further testified that in determining whether to invest the CFO or the firm might discover petitioner's whistleblower claims while conducting its due diligence. The CFO and petitioner did not pursue a professional relationship.

IV.   Petitioner's Motion

On March 30, 2017, petitioner timely filed a petition with the Court for review of the final determination pursuant to section 7623(b)(4) and Rule 341(b). On that same day, petitioner filed his motion. On April 6, 2017, the Court temporarily sealed this case pending resolution of petitioner's motion. On May 2, 2017, petitioner filed a declaration in support of his motion.

On September 20, 2017, respondent filed a response objecting to petitioner's motion (objection). On October 25, 2017, petitioner filed a reply to

**[\*15]** respondent's objection.  On January 22, 2018, respondent filed a sur-reply to petitioner's reply.

The Court conducted a hearing on petitioner's motion on February 21, 2018.  Petitioner testified at the hearing.  After the hearing, the Court issued an order directing petitioner to supplement his previously submitted declaration to include the email that petitioner had testified to during the hearing.  The Court also ordered petitioner and respondent to file simultaneous memorandums of law to address whether the societal interest in the public's right to know who is using the Court was outweighed by petitioner's alleged future economic harm and why redactions of the targets' names, as provided by Rule 345(b), would not be sufficient to prevent future economic harm to petitioner.

## Discussion

Rule 345(a) allows petitioners in whistleblower actions to move the Court for permission to proceed anonymously.  The movant must set forth a sufficient, fact-specific basis for anonymity.  Id.  The Court will permit a whistleblower to proceed anonymously if the whistleblower presents a sufficient showing of potential harm that outweighs the competing societal interest of the public's right to know who is using the Court.  See Whistleblower 12568-16W v. Commissioner, 148 T.C. __, __ (slip op. at 4-5) (Mar. 22, 2017); Whistleblower 14106-10W v.

[*16] Commissioner, 137 T.C. 183, 205 (2011); Anonymous v. Commissioner, 127 T.C. 89, 94 (2006).  The decision whether to allow a party to proceed anonymously rests within the sound discretion of the trial court.  Whistleblower 14106-10W v. Commissioner, 137 T.C. at 192; Anonymous v. Commissioner, 127 T.C. at 94.  The Court must decide whether the risk of harm to petitioner outweighs the competing societal interest at stake.

I.      Parties' Arguments

In petitioner's motion he alleges that disclosing his identity will result in the risk of retaliation, physical harm, social and professional stigma, and economic duress, harms that go beyond mere embarrassment and annoyance.  Petitioner generally alleges that disclosure of his identity may adversely affect his ability to obtain or maintain employment or reduce the amount of employment.  Petitioner also generally alleges that revealing his identity has the potential to severely damage his standing in the professional community that provides his customary source of employment.  The motion does not provide any specific examples to support the alleged risks of harm.

In the declaration petitioner asserts that he had a successful career in the finance industry before he provided information to the IRS.  Petitioner references making several disclosures of his whistleblower claims.  For instance petitioner

**[*17]** states: "Time after time, when I revealed my whistleblowing activities irrespective of the initial in-person or follow up request, the business prospects went radio silent. Repeatedly, once my actions were known, conversations ceased and doors closed." Petitioner asserts that failure to protect his identity moving forward will cause him more harm and make it impossible for him to engage investment professionals. The declaration does not provide any specific examples to support the alleged risk of economic harm to petitioner either as a student or in his future career as a real estate consultant and adviser. Petitioner does not assert in the declaration that he has changed careers.

In the declaration petitioner also alleges that he "expect[s] severe retaliation" and that "the danger of potential physical harm to me [petitioner] remains of paramount concern." Petitioner alleges a risk of potential physical harm on the basis of "various verbal confrontations or threats directly from key criminals over the years in this massive/lengthy criminal case." The declaration does not provide any specific examples or identify particular individuals related to the targets to support petitioner's alleged risk of retaliation or physical harm.

Respondent in his objection contends that petitioner had already disclosed his status as a whistleblower to multiple individuals, including other professionals in his field; was not employed by the targets; had not identified any specific

[*18] persons who could cause him harm if his identity were known; and had not set forth a sufficient, fact-specific basis that demonstrated a risk of harm to proceed anonymously.

Petitioner in his reply argues that "[t]he fact that petitioner has made a limited disclosure of his status as a whistleblower is not dispositive." Further, petitioner argues that it is "beside the point" that he experienced prior economic harm due to a loss of business opportunities resulting from his own disclosures because he sought to prevent future harm by requesting anonymity. In respondent's sur-reply, respondent again contends that the grant of anonymity would not "undo any of the alleged damage caused by petitioner's own self-disclosure".

Petitioner in his memorandum of law asserts that academic research and studies show "that whistleblowers have significantly worse career trajectories as compared to similar employees who do not engage in whistleblowing." Petitioner argues that his past experiences of economic harm after his disclosures "reasonably 'preview' the future economic harm that could result from disclosing * * * [petitioner's] identity as the petitioner in this proceeding."

Respondent in his memorandum of law contends that petitioner has not proven that petitioner's failure to obtain funding for his trading strategy was due

[*19] to his disclosures about his status as a whistleblower. Instead, respondent contends that the failure to obtain funding was just as likely to be due to the investors not being interested in the trading strategy and that none of the potential investors indicated that they decided not to invest because petitioner was a whistleblower. Respondent also contends that petitioner made the choice to change careers and that he has not shown any specific economic harm that would result in his new career from a disclosure of his identity in this proceeding.

II.     Risks of Harm

In the motion petitioner alleges that disclosing his identity will result in the risk of retaliation, physical harm, social and professional stigma, and economic duress. However, at the hearing and in the memorandum of law petitioner asserts that the primary factor to weigh is the risk of future economic harm and that the factors of social and professional stigma and economic duress are assumed by this factor.[7]

The Court has addressed a whistleblower's motion to proceed anonymously in six reports, five of which granted the whistleblower anonymity and one which denied anonymity. In Whistleblower 14106-10W v. Commissioner, 137 T.C. at

---

[7]Although petitioner testified about an aspect of his medical history, he did not assert that his case involves highly sensitive or personal information that should not be disclosed.

[*20] 185, the whistleblower became aware of an alleged tax underpayment while employed by the noncompliant taxpayer. After filing a Form 211 with the Whistleblower Office, the whistleblower obtained similar new employment outside of the noncompliant taxpayer. Id. In granting anonymity the Court found, in part, that the whistleblower had demonstrated in an affidavit a sufficiently severe risk of professional stigma, retaliation, and economic duress. The Court reasoned that disclosing the whistleblower's identity would likely cause severe damage to the whistleblower's standing in the professional community and jeopardize the whistleblower's current and future employment because the whistleblower acquired the information in the normal course of employment for the noncompliant taxpayer and was privy to internal deliberations and communications regarding the events that gave rise to the noncompliant taxpayer's underpayment. Id. at 203-204. The Court found that the whistleblower's future employability could be affected because a future employer could ask for a list of previous employers, which would include the noncompliant taxpayer, and the whistleblower could someday seek reemployment with the noncompliant taxpayer only to face retaliation. Id. at 204.

In Whistleblower 13412-12W v. Commissioner, T.C. Memo. 2014-93, at *4-*6, the Court granted the whistleblower's motion to proceed anonymously on

[*21] the basis of the facts alleged in the petition and a declaration that demonstrated that disclosure of the whistleblower's identity could result in the risk of retaliation, social and professional stigma, and economic duress. In that case the whistleblower reported tax violations of a former employer, the noncompliant taxpayer. Id. at *2. The whistleblower was retired but received retirement benefits from the noncompliant taxpayer. Id. The Court accepted the whistleblower's assertions that the noncompliant taxpayer could possibly withhold or terminate the retirement benefits, which the whistleblower relied upon and without which the whistleblower would be forced to seek future employment. Id. at *5-*6. The Court also found that the whistleblower could face professional ostracism and difficulty securing future employment. Id. at *6.

In Whistleblower 11332-13W v. Commissioner, T.C. Memo. 2014-92, at *2, and Whistleblower 10949-13W v. Commissioner, T.C. Memo. 2014-94, at *6, the Court held that the whistleblowers' asserted facts in the petitions and affidavits demonstrated that proceeding anonymously was necessary to protect their professional reputation, economic interests, and personal safety. The whistleblowers reported a tax fraud scheme they had discovered during the course of their employment that involved their employer and several related entities and subsidiary companies related to their employer, the noncompliant taxpayers.

[*22] <u>Whistleblower 10949-13W v. Commissioner</u>, T.C. Memo. 2014-94, at *2;

<u>Whistleblower 11332-13W v. Commissioner</u>, T.C. Memo. 2014-92, at*2.  The

noncompliant taxpayers were alleged to have ties to terrorist organizations, had

already used armed men to raid the whistleblowers' offices, and had previously

threatened the whistleblowers' lives.  <u>Whistleblower 10949-13W v.</u>

<u>Commissioner</u>, T.C. Memo. 2014-94, at *6; <u>Whistleblower 11332-13W v.</u>

<u>Commissioner</u>, T.C. Memo. 2014-92, at *12.

 In <u>Whistleblower 12568-16W v. Commissioner</u>, 148 T.C. at __ (slip op. at

3), the whistleblower was previously employed by an entity related to the

noncompliant taxpayer and learned about the violations in the normal course of

the whistleblower's employment.  In a declaration, the whistleblower alleged a

risk of retaliation, physical harm, social and professional stigma, and economic

duress.  <u>Id.</u> at __ (slip op. at 3).  The Court found that the whistleblower had a

well-founded concern and had made a sufficient showing that disclosure of the

whistleblower's identity would cause the noncompliant taxpayer to retaliate

against the whistleblower and the whistleblower's family, which would result in

professional and personal ostracism, economic loss, and threats to the safety of the

whistleblower's family.  <u>Id.</u> at __, __ (slip op. at 3, 8).

**[\*23]** In only one report has the Court denied a whistleblower's request to proceed anonymously. See Whistleblower 14377-16W v. Commissioner, 148 T.C. __ (June 28, 2017). The Court found that the whistleblower had not established a sufficient fact-specific basis for proceeding anonymously. Id. at __ (slip op. at 13). The whistleblower's discovery of the information leading to the whistleblower claims derived from public information. Id. at __ (slip op. at 7). The whistleblower did not have an employment or fiduciary relationship to any of the noncompliant taxpayers. The whistleblower did not identify any current or prospective clients. Id. The whistleblower did not identify any noncompliant taxpayer who would have the power to, and might be expected to, retaliate against the whistleblower. Id. at __ (slip op. at 12). The whistleblower mentioned no specific risk but relied on generalized claims to support an alleged risk of being blacklisted. Id. at __ (slip op. at 7-8). The Court acknowledged that despite the whistleblower's weak fact-specific basis for anonymity it might have otherwise been inclined "to weigh the people's interest in knowing who is using the courts as so weak as to give petitioner the benefit of the doubt". Id. at __ (slip op. at 13). However, the whistleblower was a serial whistleblower filer, and the Court ultimately held that the public's interest in knowing who was using the Court to bring serial whistleblower claims prevailed. Id. at __ (slip op. at 16).

**[*24]** A.    <u>No Credible Risk of Future Economic Harm</u>

Unlike the whistleblowers in the cases where the Court granted anonymity, petitioner is not now and never was employed by any of the targets. Petitioner did not express any intent to seek future employment with any of the targets. Petitioner did not obtain the information underlying the whistleblower claims through any confidential internal deliberations and communications in the course of his employment. None of the targets provides petitioner any employment-related benefits he could be at risk of losing. Petitioner did not hold any fiduciary position with respect to any of the targets. Other than being solicited as a potential client for the promoted investment, in which he ultimately chose not to invest, petitioner had no other relationship to any of the targets.

Petitioner argues that his identity should be protected because whistleblowers are generally perceived negatively, ostracized, and retaliated against. Petitioner asserts that "research has shown, individuals, on the whole, perceive whistleblowing negatively" and refers to a recent academic study that "found empirical evidence that, individuals who reported lies (i.e., whistleblowers) were ostracized and excluded from groups even by individuals who act honestly." Petitioner further asserts that "[t]his study explains prior research finding that whistleblowers have significantly worse career trajectories as compared to similar

**[\*25]** employees who did not engage in whistleblowing." According to petitioner, "there can be no doubt that, measured in the aggregate, whistleblowers' careers measurably suffer after their whistleblowing activities become a matter of public record." Petitioner also argues that "a recent survey by the Federal Judicial Center found a high rate of retaliation against cooperating witnesses."

The Court has addressed broad and generalized claims for anonymity such as petitioner's and rejected them in Whistleblower 14106-10W v. Commissioner, 137 T.C. 183. In a footnote the Court explained: "We do not mean to suggest that this balancing test would or should necessarily result in anonymity for all tax whistleblowers in this Court. Ultimately, absent any legislative directive to the contrary, each request to proceed anonymously must stand upon its own." Id. at 206 n.29; see also id. at 208 (Halpern, J., concurring) ("I have concurred in the result in this case because I think that we should give whistleblowers contemplating a section 7623(b)(4) action fair notice that we will not automatically grant anonymity upon a claim of possible employment discrimination."). Although petitioner's observations regarding general perceptions about whistleblowers may be valid, his request to proceed anonymously stands upon its own. Petitioner, as the movant, must set forth a sufficient, fact-specific basis for anonymity. See Rule 345(a).

**[*26]** Petitioner argues that providing proof of future harm is inherently speculative and that requiring whistleblowers seeking to proceed anonymously under Rule 345(a) to identify in every case concrete facts of future harm that will occur places an unreasonably high burden on whistleblowers. Petitioner's asserted standard under Rule 345(a) for determining whether a whistleblower should proceed anonymously is far more burdensome than the Court has applied in the cases where it has permitted a whistleblower to proceed anonymously on the basis of, among other things, risk of future economic harm. See Whistleblower 14106-10W v. Commissioner, 137 T.C. at 203-204 (considering not only the whistleblower's current employment but also future employability). The Court has acknowledged that "fears of such harm befalling a confidential informant are reasonable although necessarily difficult to prove." Id. at 203. Nevertheless, each request to proceed anonymously stands upon its own, see id. at 206 n.29, and petitioner must provide some factual basis sufficient and specific enough to allow the Court to determine whether the severity of the asserted risk of harm amounts to more than mere embarrassment or annoyance and outweighs the societal interest of the public's right to know who is using the Court. Otherwise the grant of anonymity would be automatic in every whistleblower case.

**[*27]** Petitioner argues that the specific economic harm he has already suffered following his disclosures about his whistleblower claims demonstrates that he could reasonably suffer future economic harm. Petitioner blames his disclosures about his whistleblower claims for the lack of interest by the principals and CFO in his trading strategy. However, the Court is not convinced that a connection exists, especially considering the context in which petitioner made the voluntary disclosures about his whistleblower claims.

Petitioner testified that, in contrast to the field of trading where disclosure was mandatory, the hedge fund lawyers he had spoken to "felt that full disclosure was best practice". According to petitioner, he was advised that disclosure of his whistleblower claims was a material disclosure if, as a legal matter, it interfered with his ability to perform his day-to-day employment duties or if it led to a conflict of interest with a current client. However, petitioner's testimony suggests that in making the disclosures he was motivated by a desire to be seen as an "upstander" rather than by a need to make a material disclosure and that by disclosing he stood to enhance, not discredit, his reputation.

For instance, petitioner testified:

So when I made these conversations, part and parcel to the outlook on the professional that I'm across the table is are they an upstander, have they done something in the marketplace that

[*28] denotes highly ethical behavior. And * * * [the principal of the second service provider] is famous for that. He won awards for it. And * * * [the principal of the private equity real estate firm] is similarly situated as someone who has a fantastic reputation.

Petitioner testified that in making the whistleblower claims he believed he was also being an "upstander".

Contrary to petitioner's testimony, the email from the principal of the private equity real estate firm indicates that the principal declined to invest in his trading strategy for a business purpose and that he was intrigued, not alienated, by the whistleblower claims. Although he attributes the lack of interest by these investors in his trading strategy to his status as a whistleblower, petitioner was generally unable to secure other investors to fund his trading strategy even without disclosing his status as a whistleblower.

Moreover, petitioner has abandoned his previous career and is pursuing a new one. Petitioner testified that his investment entity has been deregistered and is no longer a going concern and that he does not intend to return to his prior career as a trader. Instead, petitioner plans to be a consultant and adviser on private wealth real estate after graduating from his current master's degree program. Petitioner testified that as a consultant and adviser he would have no need to disclose his whistleblower claims because he would have no fiduciary

[*29] responsibility to do so. Petitioner also testified that if he is being paid for services as an adviser, a due diligence inquiry, which would require disclosure of his whistleblower claims, would not be needed because he would not be advising on financial matters. Petitioner has not identified any specific way in which disclosure of his identity in this case would affect either his standing as a graduate student or his future career as an adviser and consultant in private wealth real estate.

### B. No Credible Risk of Physical Harm

Although petitioner relies primarily on the economic risk factor, he also asserted that he faces a risk of physical harm. However, petitioner has not demonstrated any credible risk of physical harm to support the vague and general allegations in his motion and declaration. When asked to explain the allegation of potential physical harm on the basis of "various verbal confrontations or threats directly from key criminals over the years in this massive/lengthy criminal case", petitioner testified that he "had a two minute back-and-forth" with an individual related to one of the targets during the time when he was considering whether to invest in the promoted investment. He also testified that when he decided not to invest another individual related to one of the targets asked him to reconsider; he said no, and his refusal was followed by "some pretty colorful language".

**[\*30]** Petitioner acknowledged that he was not confronted verbally or physically by anyone related to the targets after he decided not engage in the proposed investment with the targets.  Although he testified that his vehicle was totaled at some point, petitioner had no idea how it happened or whether this was linked to any of the targets.

The Court understands that petitioner may suffer some embarrassment or annoyance if the motion is denied, but he has not provided the Court with a sufficient, fact-specific justification for proceeding anonymously.

III.    Societal Interest in Open Courtrooms

Petitioner's weak fact-specific basis for anonymity must be balanced against the competing societal interest.  See Whistleblower 12568-16W v. Commissioner, 148 T.C. at ___ (slip op. at 4-5); Whistleblower 14106-10W v. Commissioner, 137 T.C. at 205.  The Court must balance the competing social interest of protecting the identity of a whistleblower as a confidential informant with the societal interest of the public's right to know who is using the Court.  See Whistleblower 12568-16W v. Commissioner, 148 T.C. at ___ (slip op. at 4-5); Whistleblower 14106-10W v. Commissioner, 137 T.C. at 205.

There is generally a presumption of open judicial proceedings and public access to court records.  See Whistleblower 14106-10W v. Commissioner, 137

**[*31]** T.C. at 189-190 (and cases cited threat); <u>see also</u> sec. 7458 (providing that hearings before the Court shall be open to the public); sec. 7461(a) (providing that all reports of and evidence before the Court shall be public records open to the inspection of the public). However, the Court is authorized under section 7461(b)(1) to make any provision necessary to prevent the disclosure of trade secrets or other confidential information, including a provision that any document or information placed under seal be opened only as directed by the Court. Rule 345 concerns itself with privacy protections for filing whistleblower actions in this Court.

Petitioner argues that the public's interest in knowing his identity is negligible. Petitioner further argues that the right to open judicial proceedings is not absolute and does not apply to documents that have traditionally been kept secret for important policy reasons, such as whistleblower claims at the administrative level. Petitioner generally argues that "[t]he public does not have as strong a right to know who confidential informants and whistleblowers are, as they do ordinary litigants" and that "potential whistleblower petitioners must be assured that they will be reasonably protected from the harms that could result from their participation in the whistleblower program being made public."

[*32] However, petitioner's arguments ignore the presumption that proceedings before this Court are open to the public. See sec. 7458. To overcome that presumption petitioner must set forth a sufficient, fact-specific basis for anonymity, which he has not done. The Court recognizes that the Whistleblower Office has thus far kept petitioner's identity confidential, but petitioner has made voluntary disclosures in the past motivated, at least in part, by his desire to be seen as an "upstander".

Petitioner argues that the public's interest in knowing his identity is weak because this case is still in the early stages of the proceedings and no factual or legal disputes have been raised. In Whistleblower 14106-10W v. Commissioner, 137 T.C. at 205, the Court, in weighing the societal interests at stake, found that the public's interest in knowing the whistleblower's identity was relatively weak because it had just held that the Commissioner was entitled to summary judgment on a threshold legal issue that did not depend on the whistleblower's identity.

Petitioner's case is distinguishable from the whistleblower in Whistleblower 14106-10W. This case is not before the Court on a motion for summary judgment or other dispositive motion. As the Court noted in Whistleblower 12568-16W v. Commissioner, 148 T.C. at ___ (slip. op. at 5-6), "[t]he implication, of course is that, if we had not disposed of the action at the

[*33] beginning of the case on Commissioner's motion for summary judgment, the strength of the public's interest might, as the case progressed, have appeared stronger." More importantly, however, in Whistleblower 14106-10W v. Commissioner, 137 T.C. at 204, the Court found that the whistleblower had sufficiently demonstrated a risk of harm severe enough to justify granting the whistleblower anonymity. Petitioner has not sufficiently demonstrated a risk of harm here to overcome the presumption of open proceedings and to weigh in favor of granting anonymity.

Petitioner seeks to distinguish Whistleblower 14377-16W from his case by arguing that he is not a serial whistleblower filer. However, like the whistleblower in that case, petitioner's whistleblower claims are based on publicly obtained information--information he obtained while being sought out as a potential investor by the targets and on public information about the criminal proceeding against an individual associated with one or more of the targets. Petitioner's whistleblower claims are not based on information he obtained as an employee or in a fiduciary capacity. The public has an interest in knowing who is using public information in litigating a case before the Court, especially in a case like this where petitioner's weak fact-specific basis for anonymity does not outweigh the presumption of open proceedings.

**[*34]**                                    <u>Conclusion</u>

On the basis of the facts before the Court, mindful of our legal system's general solicitude for confidential informants, the Court finds that petitioner's weak fact-specific basis for anonymity does not outweigh the public's right to know who is using the Court.

Accordingly, the Court will deny petitioner's motion.

<u>An appropriate order will be issued</u>.