**10-429-ag**
**Mathis v. SEC**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**


August Term, 2010


(Argued: June 7, 2011                                    Decided: February 14, 2012)


Docket No. 10-429-ag


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


SCOTT MATHIS,

                Petitioner,

                        v.

UNITED STATES SECURITIES & EXCHANGE
COMMISSION,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: MINER, LYNCH, and LOHIER, Circuit Judges,

        Petitioner Scott Mathis seeks review of an order of the Securities and Exchange
Commission affirming the sanctions imposed by the Financial Industry Regulatory Authority,
Inc., which subjected Mathis to statutory disqualification for, among other things, failing to
disclose that certain tax liens had been filed against him by the Internal Revenue Service. We
hold that there was substantial evidence supporting the Commission's factual findings that
Mathis intentionally failed to disclose the liens on registration forms he was required to file with
FINRA and that the information regarding the liens was material. We also hold that the SEC did
not abuse its discretion in concluding that Mathis's conduct constituted a willful violation of §
3(a)(39) of the Securities Exchange Act.

        Affirmed.

ERIC S. HUTNER, Hutner Klarish LLP, New York, N.Y., *for Petitioner-Appellant*.

SUSAN S. McDONALD, Senior Litigation Counsel (David M. Becker, General Counsel; Mark D. Cahn, Deputy General Counsel; Jacob H. Stillman, Solicitor, *on the brief*), Securities and Exchange Commission, Washington, D.C., *for Respondent-Appellant*.

LOHIER, Circuit Judge:

Petitioner Scott Mathis, a registered representative and principal with various brokerage firms over the years, seeks review of a December 7, 2009, final order of the Securities and Exchange Commission (the "SEC" or "Commission"), which concluded that Mathis willfully failed to disclose the existence of certain tax liens filed against him and thereby violated § 3(a)(39) and § 15(b)(4)(A) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78c(a)(39) and 78o(b)(4)(A). The SEC's conclusion that Mathis acted willfully, which followed Mathis's appeal of various determinations of the Financial Industry Regulatory Authority, Inc. ("FINRA") and its predecessor, the National Association of Securities Dealers, Inc. ("NASD"),[1] subjects Mathis to statutory disqualification from the securities industry.

In his petition to vacate the SEC's order, Mathis argues that he was not aware that he was obligated to disclose the tax liens against him on FINRA's "Uniform Application for Securities Industry Registration or Transfer," or "Form U-4," which Mathis completed in November 1999

---

[1] On July 26, 2007, after initiating the disciplinary action against Mathis, the NASD changed its corporate name to the Financial Industry Regulatory Authority, Inc. ("FINRA"). See Securities Exchange Act Rel. No. 56146, 2007 WL 5185331 (July 26, 2007); 72 Fed. Reg. 42190-01, 2007 WL 2186071 (Aug. 1, 2007). Although the NASD instituted the disciplinary action before the name change, we use the designation "FINRA," as FINRA ultimately completed the action and sanctioned Mathis.

and August 2000. He also claims that he was unaware of his duty to amend a Form U-4 previously filed in 1995 to reflect the existence of the liens from 1996 onward. He therefore challenges the SEC's conclusion that his conduct was willful and that the tax liens were material information that had to be disclosed.

We conclude that there was substantial evidence supporting the SEC's factual finding that Mathis intentionally failed to disclose the liens on his Forms U-4 and that the liens were material. Moreover, the SEC did not abuse its discretion when it determined that Mathis's conduct constituted a willful violation of the Exchange Act's provisions relating to applications and registration. We therefore deny Mathis's petition and affirm the SEC's order.

## BACKGROUND

The following facts are either undisputed or are supported by substantial evidence in the record.

1. The Forms U-4

From 1985 through 2002, Mathis worked in the securities industry as a broker or principal with various brokerage firms. At all relevant times, FINRA has required any person who works in the investment banking or securities business of a FINRA member to register as a securities representative (e.g., a stockbroker) or principal, among other categories. NASD Rules 1022(a), 1031(a), 1032(a). To register, applicants must complete a Form U-4, in which they provide detailed information about their personal, employment, disciplinary, and financial background.

In September 1995, Mathis started as a broker with The Boston Group LP, a FINRA member, and signed and filed a Form U-4 (the "Original Form U-4"). After The Boston Group

3

dissolved in July 1998, Mathis became associated with the National Securities Corporation ("National Securities") as a broker and principal until September 2000, when he voluntarily stopped working there. For reasons not relevant here, Mathis was permitted to transfer his registration from The Boston Group to National Securities without submitting a new Form U-4.

In June 2000, Mathis became associated with InvestPrivate, Inc., a broker-dealer he founded and controlled. He signed and filed a second Form U-4 to register as a representative and principal with InvestPrivate on November 25, 1999. Starting in June 2000, Mathis also served as the chief executive officer and chairman of the board of directors of CelebrityStartUps.com, Inc. ("CelebrityStartUps"), a development-stage company he founded. On August 21, 2000, Mathis signed and filed a third Form U-4 to register as a representative and principal with CelebrityStartUps.[2]

In completing a Form U-4, applicants are required to "swear or affirm that [they] have read and understand the Items and Instructions on this form and that [their] answers (including attachments) are true and complete to the best of [their] knowledge." In addition to requiring Mathis to affirm the accuracy of his answers, all three Forms U-4 at issue in this appeal – the Original Form U-4 and the two later forms filed in 1999 and 2000 – required Mathis to update the information he provided on the forms "by causing an amendment to be filed on a timely basis whenever changes occur to answers previously reported." He further represented that "to the extent any information previously submitted is not amended, the information provided in this

---

[2] Although Mathis voluntarily withdrew the FINRA membership application for CelebrityStartUps in April 2001, he remained registered with FINRA as a general securities representative and principal of InvestPrivate from 2000 until he was statutorily disqualified in 2008.

form is currently accurate and complete." Similarly, the general instructions for each form warned Mathis that he was "under a continuing obligation to update information required by Form U-4 as changes occur." NASD Notice to Members No. 92-19 (April 1992), 1992 NASD Lexis 50, at *6 n.3; see Form U-4 Instructions, FINRA, 1 (May 18, 2009), http://www.finra.org/web/groups/industry/@ip/@comp/@regis/documents/appsupportdocs/p015 111.pdf.

In addition to the Forms U-4 themselves, Article V, § 2(c) of the FINRA By-Laws requires that associated persons keep their Forms U-4 "current at all times," and that amendments to the Form U-4 be filed "not later than 30 days after learning of the facts or circumstances giving rise to the amendment." Failing to file prompt amendments to a Form U-4 violates NASD Conduct Rule 2110. See also FINRA Membership, Registration and Qualification Requirements ("FINRA Membership Rule"), IM-1000-1 (applicable rule prior to 2009, providing that an incomplete or inaccurate filing of information with FINRA by a registered representative "may be deemed to be . . . sufficient cause for appropriate disciplinary action"). A person who willfully makes a false or misleading statement or a material omission in a Form U-4 is subject to the penalty of statutory disqualification. Exchange Act § 3(a)(39)(F), 15 U.S.C. § 78c(a)(39)(F).

2. The Tax Liens

In separate written notices between August 1996 and September 2002, the Internal Revenue Service ("IRS") informed Mathis that it had entered five unsatisfied tax liens against him, totaling $634,436.28, due to Mathis's failure to pay a substantial portion of his personal income taxes owed for tax years 1993, 1994, 1995, 1997, 1999 and 2000. The five liens were as

follows: (1) a $274,526.68 lien entered August 9, 1996, in connection with his unpaid taxes for 1993 and 1994 (the "August 1996 Tax Lien"); (2) a $53,302.53 lien entered September 23, 1998, in connection with unpaid taxes for 1995 (the "September 1998 Tax Lien"); (3) a $179,429.07 lien entered May 11, 1999, in connection with his unpaid taxes for 1997 (the "May 1999 Tax Lien"); (4) a $92,985.14 lien entered July 2, 2002, in connection with unpaid taxes for 1999 (the "July 2002 Tax Lien"); and (5) a $34,192.86 lien entered September 9, 2002, in connection with unpaid taxes for 2000 (the "September 2002 Tax Lien"). Each of these notices advised Mathis that the IRS had "made a demand for payment" of the unpaid tax liability and informed him that, as a consequence of his nonpayment, "there is a lien in favor of the United States on all property and rights to property belonging to [Mathis] for the amount of these taxes . . . ."

In addition, sometime in 1999, after receiving most of the IRS notices, Mathis appears to have requested to pay his overdue taxes in installments. In letters to Mathis in late 1999 and 2002 approving his request, the IRS emphasized that to "protect the government's interest . . . . a Notice of Federal Tax Lien HAS ALREADY BEEN FILED." The letters explained, moreover, that "[a] Notice of Federal Tax Lien is a public notice that the government has a claim against your property to satisfy a debt" and that the government would "release (remove) the lien" only when Mathis had paid what he owed.

Although the IRS notices alone provide substantial evidence that Mathis was aware of the unsatisfied tax liens, Mathis was also aware of the liens through other sources, including a work colleague. Tim Holderbaum, whom Mathis had hired to design a website for InvestPrivate, informed Mathis in December 2001 about a credit check that revealed Mathis was subject to a tax lien. In an email to Mathis dated December 6, 2001, Holderbaum wrote that he could not

obtain the necessary credit approval to establish an online store for InvestPrivate "till the tax lean [sic] issue is resolved." Holderbaum further testified that Mathis did not express any "concern or reservation" about that information.

Having learned of their existence as early as 1996, Mathis knowingly failed to disclose the liens on the two Forms U-4 filed in 1999 and 2000, failed timely to amend the Original Form U-4 to reflect those liens, and failed as well to amend the 1999 or the 2000 Forms U-4 to reflect the July 2002 and September 2002 Tax Liens.

Mathis's efforts to conceal the liens also involved affirmative misrepresentations. On both the 1999 and 2000 Forms U-4, for example, Mathis responded "no" to the question "Do you have any unsatisfied judgments or liens against you?" Similarly, on an Annual Representative Certification for National Securities, dated January 19, 1999, Mathis claimed that he had "paid all federal, state, and local taxes due in full," and falsely denied having "any liens . . . entered against you, which were not previously disclosed on [F]orm U-4."

By letter dated July 3, 2003, FINRA asked Mathis to explain his failure to disclose the five federal tax liens. The letter prompted Mathis to disclose the liens for the first time on an amended Form U-4, which he filed eleven days later. Mathis paid the liens approximately one month after disclosing them, and the IRS released the liens a few months thereafter.

Mathis attempted to explain his failure to disclose the liens in a series of responses to FINRA's letter request. Initially, he claimed that "to the best of [his] recollection, [he] was not aware of the pendency of any federal tax liens at such times and further was not aware of any obligation to report such matters on Form U-4." In subsequent testimony during an on-the-record interview with FINRA staff in August 2003, Mathis acknowledged that he had received

the five IRS notices, but advanced several other explanations for his failure to disclose the liens. First, Mathis claimed that he had relied on the advice of a Boston Group colleague and former FINRA official, Kye Hellmers, whose understanding was "that if matters were not directly related to the securities industry, they need not be reported on the Form U4." Second, Mathis testified that he thought a distinction existed between an IRS "notice" of a tax lien and the tax lien itself, and that he was not obligated to report the IRS notice. Third, Mathis explained that on the January 1999 National Securities Annual Representative Certification, a "lack of concentration" caused him to answer "YES" to the question whether he had paid his federal, state, and local taxes. Fourth, he testified that he only cursorily reviewed the IRS notices of tax liens before forwarding them to his accountant, who was working directly with the IRS on a payment plan to address Mathis's federal tax debt.

### 3. Procedural History

In February 2005, FINRA's Division of Enforcement filed a multi-count complaint against Mathis that charged him, as relevant to this appeal, with willfully failing to amend his Original Form U-4 to disclose the liens, and willfully failing to disclose the tax liens on the two Forms U-4 filed in 1999 and 2000, when he started InvestPrivate and CelebrityStartUps. In May 2007, the parties entered into a settlement in which some of the charges were dismissed and others settled, while three counts against Mathis remained, all of which concerned the tax liens at issue. Mathis denied these remaining charges and requested a hearing before a FINRA Hearing Panel, which was held in July 2007 and lasted for two days.

In December 2007, a FINRA Hearing Panel (the "Panel") determined that Mathis became aware of the disclosure requirement after January 1999 and thereafter willfully failed to disclose

the tax liens on his Forms U-4. The Panel found that Mathis "made a conscious effort to conceal his tax liabilities from his [new] employer" by falsely representing on the National Securities Annual Certification in January 1999 that he was current in his taxes. Although it concluded that Mathis had not acted willfully with respect to events from 1996 to January 1999—because he had reasonably relied on the advice of Hellmers, his former Boston Group colleague—the Panel nevertheless imposed a $10,000 fine and a three-month suspension for failing to disclose the tax liens on his Forms U-4 after January 1999.[3]

Mathis appealed the Panel's decision to the FINRA National Adjudicatory Council (the "NAC"). In a decision issued in December 2008, the NAC largely affirmed the Panel's decision, but disagreed with its finding that Mathis had reasonably relied on Hellmers's advice from 1996 to January 1999. Instead, the NAC concluded that Mathis had willfully failed to amend his Form U-4 to disclose the five tax liens from the time he received the notice of the first tax lien in August 1996 through mid-2003. In particular, the NAC found that Hellmers had offered only his "opinion" about Mathis's obligation to report the liens, and that he had specifically advised Mathis that it was the responsibility of The Boston Group's compliance department to determine if an unsatisfied tax lien should be reported. Although the NAC found that Mathis's violations started as early as 1996, it affirmed the Panel's sanction, describing it as "an appropriately remedial sanction for Mathis's willful failure to amend his Form U4 to disclose the five tax liens at issue and his willful failure to disclose the tax liens pending against him at the time he filed two initial Forms U4."

---

[3] Mathis also was sanctioned for intentionally failing to disclose a customer complaint and a customer-initiated court action. These sanctions are not at issue in this appeal.

9

Mathis petitioned the SEC to review the NAC decision, challenging principally the NAC's finding of willfulness and arguing that statutory disqualification was an excessive sanction.[4] Rejecting Mathis's claim that he was unaware of the existence of the liens pending against him and that he had reasonably relied on the advice of his colleague, the SEC sustained the NAC's substantive decision relating to Mathis's Forms U-4 as well as the sanctions imposed against him. It determined that Mathis had "voluntarily provided false answers on his Form U4" regarding the tax liens and that the nondisclosure was material. Explaining that willfulness "means that the respondent 'intentionally committ[ed] the act which constitutes the violation'" and "does not require that the person 'also be aware that he is violating one of the Rules or Acts,'" the SEC concluded that Mathis had "willfully violated Membership Rule IM-1000-1 and Conduct Rule 2110." The conclusion that Mathis acted willfully, by operation of §§ 3(a)(39)(F) and 15A(g)(2) of the Exchange Act, 15 U.S.C. §§ 78c(a)(39)(F) and 78o-3(g)(2), subjected Mathis to a "statutory disqualification," or bar, from associating with any FINRA member firm—potentially a more severe sanction than a monetary penalty or temporary suspension. See Feins v. Am. Stock Exch., Inc., 81 F.3d 1215, 1218 n.1 (2d Cir. 1996) ("Statutory disqualifications include primarily prior felony convictions, willful violations of the federal securities laws, and other conduct that has, or could have, resulted in expulsion or suspension from a self-regulatory organization."); Exchange Act § 15A(g)(2), 15 U.S.C. § 78o-3(g)(2) ("A registered securities association may, and in cases in which the Commission, by order, directs as necessary or appropriate in the public interest or for the protection of investors shall, deny

---

[4] Mathis did not challenge FINRA's finding that he failed timely to amend his Form U-4 to disclose the five tax liens or its finding that he failed to disclose the then-pending tax liens on the two Forms U-4 filed in 1999 and 2000 relating to InvestPrivate and CelebrityStartUps.

membership to any registered broker or dealer, and bar from becoming associated with a member any person, who is subject to a statutory disqualification.").

Mathis timely filed this petition to review and vacate the SEC's order, insofar as it determined that he was subject to statutory disqualification.

**DISCUSSION**

1. Jurisdiction and Standard of Review

FINRA regulates member brokerage firms and exchange markets, subject to oversight by the SEC. Exchange Act §§ 15A, 15A(b)(6), 15 U.S.C. §§ 78o-3, 78o-3(b)(6). The Exchange Act requires FINRA to promulgate rules "to prevent fraudulent and manipulative acts and practices" and to discipline its members when they violate those rules. Exchange Act § 15A(b)(6), 15 U.S.C. § 78o-3(b)(6). On the petition of a disciplined party, any disciplinary action taken by FINRA is reviewed by the SEC, which conducts a de novo review of the record and make its own findings as to whether the alleged conduct violated FINRA rules. See Exchange Act §§ 19(d)(2), 19(e)(1), 15 U.S.C. §§ 78s(d)(2), (e)(1); PAZ Sec., Inc. v. SEC, 494 F.3d 1059, 1064-65 (D.C. Cir. 2007). The SEC's order is subject to review by this Court. See, e.g., Heath v. SEC, 586 F.3d 122, 131 (2d Cir. 2009).

"[W]e will affirm the SEC's findings of fact if supported by substantial evidence." VanCook v. SEC, 653 F.3d 130, 137 (2d Cir. 2011); see MFS Sec. Corp. v. SEC, 380 F.3d 611, 617 (2d Cir. 2004); 15 U.S.C. §§ 78y(a)(4), 80a-42(a), and 80b-13(a); 15 U.S.C. § 77i ("The finding of the Commission as to the facts, if supported by evidence, shall be conclusive."). Under the Administrative Procedure Act, we will set aside the SEC's actions, findings, or conclusions of law only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not

11

in accordance with law." 5 U.S.C. § 706(2)(A); see D'Alessio v. SEC, 380 F.3d 112, 120 (2d Cir. 2004). "We will not disturb the SEC's choice of sanction unless it is 'unwarranted in law or without justification in fact.'" VanCook, 653 F.3d at 137 (quoting Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 186 (1973)).

2. Statutory Framework

Pursuant to § 15A of the Exchange Act, FINRA enacted Membership Rule IM-1000-1 governing Forms U-4, which is used to screen applicants for registration as securities professionals and to ensure that their applications and registration materials are accurate and up-to-date. At the time Mathis completed his Forms U-4, Rule IM-1000-1 provided as follows:

> The filing with the Association of information with respect to membership or registration as a Registered Representative which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or the failure to correct such filing after notice thereof, may be deemed to be conduct inconsistent with just and equitable principles of trade and when discovered may be sufficient cause for appropriate disciplinary action.

"Appropriate disciplinary action" includes "statutory disqualification" from association with a broker or dealer.[5] Under § 3(a)(39)(F) of the Exchange Act, a person may be barred from associating with a broker or dealer if that person has

> willfully made or caused to be made in any application for membership or participation in, or to become associated with a member of, a self-regulatory organization . . . any statement which was at the time, and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or

---

[5] Under the FINRA By-Laws, as a person subject to disqualification, Mathis cannot become associated with or continue to be associated with any FINRA member firm unless the member firm applies to FINRA and is granted permission for Mathis to be associated with the firm. FINRA By-Laws, Art. III, §§ 3(b) & (d).

12

> has omitted to state in any such application . . . any material fact which is required to be stated therein.

Exchange Act § 3(a)(39)(F), 15 U.S.C. § 78c(a)(39)(F).

### 3. Willfulness

Mathis argues that the SEC's interpretation of the term "willful" is without support in the context of either § 3(a)(39)(F) or § 15(b)(4)(A) of the Exchange Act. We disagree. The SEC did not abuse its discretion when it concluded that Mathis willfully failed to disclose the tax liens within the meaning of § 3(a)(39)(F)(4) because he "voluntarily provided false answers on his Form U4."

In determining the meaning of the word "willfully" in § 3(a)(39), we look to the use of the same term in what Mathis acknowledges is an analogous provision, § 15(b)(4)(A) of the Exchange Act. Section 15 is entitled "Registration and Regulation of Brokers and Dealers." Section 15(b)(4)(A) authorizes the SEC to sanction brokers who "willfully" make a false statement on an application for registration required to be filed with the SEC. See 15 U.S.C. § 78o(b)(4)(A). Specifically, § 15(b)(4)(A) permits the SEC to "censure, place limitations on the activities, functions, or operations of, suspend for a period not exceeding twelve months, or revoke the registration of any broker or dealer if it finds" that such broker or dealer

> has willfully made or caused to be made in any application for registration . . . required to be filed with the Commission or with any other appropriate regulatory agency[6] under this chapter, . . . any

---

[6] Under the Exchange Act, the term "other appropriate regulatory agency" may apply to any one of at least four federal government agencies: the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the SEC. See § 3(a)(34), 15 U.S.C. § 78c(a)(34). It does not include self-regulatory organizations like FINRA, which are separately defined in the Exchange Act. See 15 U.S.C. § 78c(a)(26).

statement which was at the time and in light of the circumstances under which it was made false or misleading with respect to any material fact, or has omitted to state in any such application . . . any material fact which is required to be stated therein.

Id.

Section 15(b)(4)(A) finds a statutory counterpart in § 3(a)(39)(F) of the same Act, which applies to applications and registrations filed with non-government self-regulatory organizations, such as FINRA, rather than the SEC or defined governmental regulators. Like § 15(b)(4)(A), § 3(a)(39)(F) subjects brokers to disqualification from the securities industry for willfully making false or misleading statements on registration forms and applications. Both provisions promote accurate disclosure by securities professionals in order to maintain a high level of business ethics in the securities industry.

In Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965), we analyzed another subsection of Section 15, § 15(b)(4)(D) of the Exchange Act, 15 U.S.C. § 78o(b)(4)(D),[7] which permits the SEC to sanction a broker or dealer who has "willfully violated any provisions of the Securities Act of 1933." The SEC had determined that Tager willfully violated certain anti-fraud and anti-manipulation provisions of the Securities Act of 1933 and the Exchange Act, as well as Rules promulgated under both Acts. Tager, 344 F.2d at 7. We rejected Tager's argument that the broker must have understood that he was violating a particular rule in order to be found to have willfully violated that rule. In doing so, we explained that "[i]t has been uniformly held that 'willfully' in this context means intentionally committing the act which constitutes the

---

[7] Tager analyzed § 15(b)(2)(D) of the Exchange Act, which became § 15(b)(4)(D) in 1975.

14

violation. There is no requirement that the actor also be aware that he is violating one of the Rules or Acts." Id. at 8; see also Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (upholding the Commission's determination that, for the purpose of § 15, "willfulness" requires only "that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law." (internal quotation marks omitted)).[8]

Tager's definition of "willful" applies as much to § 15(b)(4)(A) as it does to § 15(b)(4)(D); there is no good reason to differentiate the meaning of the same word in different subsections. See Sorenson v. Sec'y of Treasury of United States, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)). Given the parallel language and common purpose of the provisions located in both § 3 and § 15 of the Exchange Act, Tager's formulation of "willfulness" naturally extends to willful violations under § 3 involving Forms U-4.

We therefore reject Mathis's argument that a finding of "willfulness" under § 3(a)(39)(F) would have required a determination that Mathis was aware that he was violating a particular rule or regulation. The SEC's definition of "willful" as it applies to Mathis was neither arbitrary and capricious, nor an abuse of discretion. We note, moreover, that the SEC itself has consistently applied this definition to misleading answers on a Form U-4. See, e.g., Jason A.

---

[8] The word "willfully" has been held in other contexts to require knowledge of a legal duty and an intentional violation of that duty. See e.g., Cheek v. United States, 498 U.S. 192, 201 (1991). But "willful" is a "word of many meanings, its construction often being influenced by its context." Spies v. United States, 317 U.S. 492, 497 (1943). The interpretation of the term in Cheek is explicitly limited to "criminal tax cases," 498 U.S. at 199-200, due to the complexity of the tax law and the particular severity of the criminal sanction. Neither factor applies here.

15

Craig, Exchange Act Rel. 59137, 94 SEC Docket 2962, 2008 WL 5328784, at *4 (Dec. 22, 2008) ("A willful violation of the securities laws means merely that the person charged with the duty knows what he is doing." (internal quotation marks omitted)).

Mathis is therefore subject to statutory disqualification under § 3(a) if he intentionally submitted an application to register with a FINRA member knowing that the application contained material false information. Mathis does not even challenge the finding that he intentionally provided false answers on the forms. At oral argument on appeal, he acknowledged that substantial evidence existed in the record that he knew his Forms U-4 contained errors when he signed them. Tr. of Oral Arg. at 5. In any event, the SEC found that Mathis's conduct involved much more than an inadvertent filing of an inaccurate form, which would not have supported a determination that his conduct was willful, and that, to the contrary, Mathis "voluntarily provided false answers on his Form U4." Our review of the record confirms that there is substantial evidence to support the SEC's finding that Mathis received the IRS notices starting in 1996 and was aware of the tax liens when he filed his 1999 and 2000 Forms U-4, and that on both forms he falsely and intentionally denied having "any unsatisfied judgments or liens against [him]." For instance, the IRS emphasized in letters to Mathis in late 1999 and 2002 that "a Notice of Federal Tax Lien HAS ALREADY BEEN FILED." In addition, a colleague informed Mathis in December 2001 about a credit check that revealed that Mathis was subject to a tax lien.

The SEC's finding that Mathis also intentionally failed to amend the Original Form U-4 to disclose the August 1996, September 1998, and May 1999 Tax Liens was similarly supported by substantial evidence. Although it is true that, standing alone, Mathis's failure to amend the

16

original form might have constituted evidence of an innocent oversight, at least three facts in the record virtually compel the conclusion that Mathis's failure was intentional rather than inadvertent. First, the Original Form U-4 clearly warned Mathis that he was under a continuing obligation to disclose changes to previously reported answers, including those relating to any unsatisfied liens in order to ensure that the information on the form remained "currently accurate and complete." Second, in January 1999, Mathis signed the National Securities Annual Certification, which required him to disclose "any liens . . . entered against [him], which were not previously disclosed on form U-4" and specifically asked whether Mathis had paid all his taxes in full. Mathis concealed the liens and represented, falsely, that he had paid his taxes. That Mathis affirmatively lied about paying his taxes strongly supports the inference that he intentionally concealed the liens filed against him. Similarly, Mathis's failure to disclose the liens despite the Certification's specific reference to "any liens . . . entered against [him], <u>which were not previously disclosed on form U-4</u>" serves only to corroborate the SEC's conclusion that his failure to amend the Original Form U-4 was intentional. Third, Mathis's two other Forms U-4 (filed in November 1999 and 2000) clearly reminded Mathis of his continuing obligation to update all of his Forms U-4, including the Original Form U-4, which remained unchanged until July 23, 2003.

Pointing to the evidence of his reliance on Hellmers, his colleague at The Boston Group, Mathis argues that a broker who justifiably relies on advice from a person of suitable experience, position and knowledge has not engaged in willful conduct.[9] That proposition may be true, but

---

[9] Mathis also refers to evidence that, in 1993, he was informed by a compliance officer at Gruntal & Co., Inc., where he was then employed, that he was not required to take any action after a tax lien was entered against him. That conversation, however, related to a separate tax

17

we need not address it because the SEC found that Mathis had <u>not</u> justifiably relied on any advice. To the contrary, the SEC found that Hellmers specifically advised Mathis that it was the responsibility of The Boston Group's compliance department to determine if a tax lien was a "reportable event," "[t]here is no evidence in the record showing that The Boston Company's [sic] compliance department ever considered the tax lien issue and, further, it is undisputed that the compliance department never affirmatively advised Mathis that he could answer 'no' to the lien question on the Form U4." The SEC's factual finding that Mathis was not able to rely reasonably on Hellmers's advice without corroborating advice from Boston Group's compliance department was supported by substantial evidence in the record, particularly since Mathis never sought the advice of the compliance department.

Having found that the two Forms U-4 filed in 1999 and 2000 each contained a statement that Mathis knew was incorrect, and that Mathis intentionally failed to amend the Original Form U-4, the SEC was justified in concluding that the nondisclosure constituted a willful violation under § 3(a)(39) of the Exchange Act.

4. <u>Materiality</u>

Mathis also urges us to vacate the SEC's order on the ground that the information about the tax liens was not material. We do not think the SEC's finding that the liens were material lacked substantial evidence to support it. The SEC employed the proper and familiar test for materiality set forth in <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976): "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been

lien and took place several years before the first tax lien involved here was issued. The SEC therefore properly rejected Mathis's argument that he justifiably relied on that compliance officer's advice.

18

viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." In determining that Mathis's repeated failure to disclose the liens was material, the SEC reviewed "the large dollar amount of the liens, the number of the liens, and the lengthy period of time during which this information was not disclosed," and it concluded that "Mathis's omissions significantly altered the total mix of information made available to [FINRA], other regulators, employers, and investors." As the SEC observed in its decision, Mathis himself acknowledged on the record that he would want to know about an employee's serious financial problems before hiring him or her because "it could be an indication that the broker is under financial pressure," as Mathis was at the time he failed to pay his taxes.

Given the evidence and the inarguable importance of accurate disclosure on Forms U-4 regarding a registered representative's serious financial problems, we have no difficulty in affirming the SEC's conclusion that the tax liens were material.

**CONCLUSION**

For the reasons stated, the petition for review is DENIED, and the order of the SEC is AFFIRMED.