*Gonnella v. Securities and Exchange Commission*

# In the
# United States Court of Appeals
# For the Second Circuit

_____

AUGUST TERM 2019

(Argued: September 9, 2019          Decided: April 2, 2020)

Docket No. 16-3433

_____

THOMAS C. GONNELLA,

*Petitioner,*

*v.*

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*


Before:          WESLEY, CHIN, SULLIVAN, *Circuit Judges*

_____

Petitioner Thomas C. Gonnella challenges a decision of the Securities and Exchange Commission (the "Commission") finding that he violated section 17(a)(1) of the Securities Act of 1933, section 10(b) of the Securities Exchange Act of 1934, and Exchange Act Rules 10b-5(a) and (c) promulgated thereunder, and that he aided and abetted his employer's violations of its books and records requirements under the Exchange Act and associated regulations. Gonnella argues that the Commission committed a number of constitutional and statutory violations, and that the evidence was insufficient to support the Commission's findings. We disagree. Accordingly, we **AFFIRM**.

_____

ANDREW J. FRISCH (Jason D. Wright *on the brief*), The Law Offices of Andrew J. Frisch, New York, NY, *for Petitioner.*

JOSHUA M. SALZMAN (Mark B. Stern, Mark R. Freeman, Melissa N. Patterson, Megan Barbero, Daniel Aguilar, Tyce R. Walters, *on the brief*), *for* William P. Barr, Attorney General, U.S. Department of Justice, Washington, DC, *for Respondent.*

PAUL G. ALVAREZ, Senior Counsel (Dominick V. Freda *on the brief*), *for* Michael A. Conley, Solicitor, Securities and Exchange Commission, Washington, DC, *for Respondent.*

_____

RICHARD J. SULLIVAN, *Circuit Judge*:

Petitioner Thomas C. Gonnella challenges an Opinion and Order of the Securities and Exchange Commission (the "SEC" or "Commission") finding that he violated section 17(a)(1) of the Securities Act of 1933 (the "Securities Act"),

section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Exchange Act Rules 10b-5(a) and (c), and that he aided and abetted his employer's violations of its books and records requirements under Exchange Act section 17(a) and Rule 17a-3(a)(2). Specifically, Gonnella argues that (1) the SEC's designation of an Administrative Law Judge ("ALJ") who was not appointed pursuant to the Appointments Clause violated the Constitution's separation of powers; (2) the Commission's use of a cooperating witness violated 5 U.S.C. § 553 and Gonnella's right to due process; (3) the ALJ impermissibly engaged in independent fact-finding; and (4) the Commission violated due process when it increased the monetary sanctions imposed by the ALJ. Gonnella further argues that there was insufficient evidence to support the Commission's findings. Because, as explained below, we find that the Commission's actions were proper and the evidence was sufficient to support the Commission's findings, we deny the petition for review and affirm the SEC's order in its entirety.

## I.  BACKGROUND

Gonnella was a bond trader who specialized in proprietary trading of esoteric asset-backed securities at Barclays, a multinational investment bank and financial services company, from October 2008 until his termination in November

2011.[1]  In this role, Gonnella received an annual base salary ranging from $85,000 to $105,000 and annual bonuses of as much as $900,000.  Barclays entrusted Gonnella to invest almost $300 million, and he earned the firm profits of about $17 million.

This case stems from a series of trades that Gonnella executed to avoid Barclays's "aged[-]inventory policy" – a policy designed to "help optimize balance sheet usage through timely turnover of inventory."  App'x 437.  Pursuant to that policy, traders were penalized for holding securities for more than ninety days.  In particular, the firm charged a fee to traders' books of 0.5% of the market value of these securities.  If the trader then sold these securities within seven months, the firm refunded this fee; but after seven months, the fee became final.  The policy served as a risk-management tool to help ensure that the securities in traders' books accurately reflected the market price, and to make sure that traders did not engage in strategies that were inconsistent with the firm's objectives or applicable regulations.

---

[1] The Exchange Act defines asset-backed securities as "a fixed-income or other security collateralized by any type of self-liquidating financial asset (including a loan, a lease, a mortgage, or a secured or unsecured receivable) that allows the holder of the security to receive payments that depend primarily on cash flow from the asset." 15 U.S.C. § 78c(a)(79)(A). Esoteric asset-backed securities are complex securities with a small market of buyers, which are usually backed by unusual assets such as timeshare rentals, shipping containers, and entertainment royalties. Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), banking entities like Barclays are now prohibited from engaging in proprietary trading. Pub. L. No. 111-203, § 619, 124 Stat. 1376, 1620–31 (2010); 17 C.F.R. § 255.3 (implementing Section 619 of the Dodd-Frank Act).

Gonnella testified that he was aware of Barclays's policies, including the aged-inventory policy, and that each month he received and reviewed an email that contained information regarding the age of the securities he held as well as any penalties he might face based on the age of these securities. Gonnella further testified that he was aware that Barclays prohibited "parking," defined as "[h]olding or hiding securities in a trading account, customer account, a fictious account[,] or another firm," App'x 456, for "the purpose of concealing the true ownership of the securities, particularly at the end of the reporting period," App'x 678. Gonnella understood that executing "[t]rades that lack[ed] a real shift in ownership risk or benefit" was prohibited. App'x 678. Under Barclays's aged-inventory policy, any pre-arranged trades had to "be completely documented at the time of the initial transaction," and Barclays's considered each such transaction to be "presumptively improper." App'x 444.

Gonnella arranged twelve trades with Ryan King, a trader at the now-defunct broker-dealer firm Gleacher, which were designed to avoid the aged-inventory charges. King had little experience with trading securities like this, and the record reflects that Gonnella largely set the terms of the trades. Although Gonnella disputes that he agreed to repurchase the securities after the reporting

5

period, King testified that he was "[i]ncredibly sure" and "didn't have a doubt" that Gonnella would repurchase these securities at a higher price just days after selling them to him. App'x 104-06. King testified that Gonnella used "coded" language to communicate some of the details of their trades because the trades violated certain financial rules. *E.g.,* App'x 102–03, 119. The record is clear that Gonnella did in fact repurchase these securities from King soon after the deadline for the aged-inventory charges had passed.

Barclays's trade monitoring system flagged as suspicious four of the five trades Gonnella made with King at the end of August 2011. For each, Gonnella sold securities on August 31 and then repurchased them on September 2, 2011. When an individual from the firm's compliance department questioned Gonnella, he did not disclose that he traded the securities to avoid the charges. Instead, Gonnella stated that he sold the securities in order to "get more individuals involved in the bonds," which he endeavored to do through Gleacher's contacts. S. App'x 66–67; *see also* App'x 393. Gonnella further stated that he repurchased them – at a higher price than he sold them – because he believed he could repackage them and resell them for a higher profit.

6

King and Gonnella subsequently executed a number of additional trades, even as Gonnella faced increased scrutiny from his supervisor, Matthew Miller. King and Gonnella exchanged numerous messages through Bloomberg terminals about the trades, and later exchanged text messages and phone calls in violation of Barclays's policy banning the use of personal communication devices to conduct business. When Miller questioned Gonnella about these trades, Gonnella again did not disclose any agreement with King, and instead stated that he thought he could resell the securities at a higher price. Miller warned Gonnella that he would be scrutinizing his trades.

In late 2011, Miller and Gonnella attended Barclays's annual compliance training, at which the rule against parking was specifically discussed. Soon thereafter, Miller became increasingly suspicious of Gonnella's trades, and informed Gonnella that he planned to mention them to management. After learning this, Gonnella reported the trades to the compliance department himself, but again did not disclose any agreement with King to repurchase the securities. Barclays subsequently terminated Gonnella, and disclosed the matter to the SEC. In this disclosure, Barclays stated that it did not believe Gonnella violated any

securities laws but said that he was not "forthright" during his interview. App'x 690–91.

The Commission initiated administrative proceedings against Gonnella and ordered an ALJ to conduct a hearing. The ALJ found Gonnella violated section 17(a)(1) of the Securities Act, section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5(a) and (c). The ALJ also concluded that Gonnella had aided and abetted Barclays's violations of the books and records requirements of the Exchange Act and the rules promulgated thereunder. The ALJ then imposed a cease and desist order, a civil penalty of $82,500, and a twelve-month collateral and penny-stock suspension.

Both Gonnella and the SEC's Enforcement Division petitioned the Commission for review of the ALJ's decision. In a decision dated August 10, 2016, the Commission concluded, after reviewing the facts and law *de novo*, that Gonnella violated each of the provisions at issue. The Commission then reassessed the appropriate penalties. Like the ALJ, the Commission ordered a civil penalty of $82,500. Unlike the ALJ, however, it barred Gonnella from working in the securities industry for life, though it permitted him to reapply in five years.

Gonnella appealed to this Court for review on October 11, 2016. Because Gonnella challenged the constitutionality of the ALJ mechanism, this case was stayed pending the Supreme Court's resolution of *Lucia v. SEC*, 138 S. Ct. 2044 (2018).

## II. STANDARD OF REVIEW

"The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." 15 U.S.C. § 78y(a)(4); *Mathis v. SEC*, 671 F.3d 210, 215–16 (2d Cir. 2012). "Under the Administrative Procedure Act, we will set aside the SEC's actions, findings, or conclusions of law only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Mathis*, 671 F.3d at 216 (quoting 5 U.S.C. § 706(2)(A)). "We will not disturb the SEC's choice of sanction unless it is unwarranted in law or without justification in fact." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

Gonnella raises a number of points in his petition: (1) the Commission violated the Appointments Clause by delegating the matter to an ALJ; (2) the Enforcement Division's cooperator policy violated the Administrative Procedure Act ("APA") and due process; (3) the ALJ committed improper fact-finding; (4) the

9

Commission's decision rested on insufficient evidence; and (5) the Commission improperly increased Gonnella's sanctions. We address each point in turn below.

## A. Gonnella Forfeited His Constitutional Challenge by Not Raising It During the Administrative Proceedings

Gonnella first challenges the Commission's order on the ground that the Commission violated the Appointments Clause of Article II of the Constitution when it designated the case to an ALJ. In June 2018, while this appeal was pending, the Supreme Court confirmed that ALJs employed by the SEC are inferior officers who must be appointed in accordance with the Appointments Clause. *Lucia*, 138 S. Ct. 2053–54. Today, we are asked to decide whether a litigant may challenge the constitutionality of the ALJ's appointment for the first time on appeal.

"[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while [the agency] has opportunity for correction in order to raise issues reviewable by the courts." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36–37 (1952). Constitutional claims are no different. *See Freytag v. Comm'r*, 501 U.S. 868, 893 (1991) (Scalia, *J.*, concurring in part and concurring in the judgment) ("Appointments Clause claims, and other structural constitutional claims, have no

special entitlement to review."). "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Yakus v. United States*, 321 U.S. 414, 444 (1944). While the Supreme Court in *Freytag* recognized there may be "rare cases" in which a petitioner may raise an objection on appeal that was not raised to the administrative body, *Freytag*, 501 U.S. at 879, it "neither accept[ed] nor reject[ed]" the petitioners' proposal to "adopt[] a general rule that 'structural' constitutional rights as a class simply *cannot* be forfeited," *id.* at 893 (Scalia, *J.*, concurring in part and concurring in the judgment).[2]

Four years after *Freytag*, the Supreme Court indicated that an Appointments Clause challenge must generally be "timely" to be considered on appeal. *See Ryder v. United States*, 515 U.S. 177, 182–83 (1995). The Supreme Court recently emphasized this again in *Lucia*, stating that "'one who makes a *timely* challenge to the constitutional validity of the appointment of an officer who adjudicates his case' is entitled to relief." 138 S. Ct. at 2055 (emphasis added) (quoting *Ryder*, 515

---

[2] *Samuels, Kramer & Co. v. Commissioner*, 930 F.2d 975 (2d Cir. 1991), cited by Gonnella during oral argument, is not to the contrary. There, we held that "[a]lthough . . . [a] Company affirmatively elected to proceed in the Tax Court, this choice of forum in itself cannot be equated with a waiver of constitutional safeguards," especially where that company "challenged the assignment of its cases to a special trial judge from the outset." *Id.* at 983. We thus examined not whether the failure to object constituted forfeiture of a claim, but whether a petitioner who *did* object could be deemed to have subsequently waived its claim "through silence or mere submission to the jurisdiction of the forum." *Id.* at 984; *see also United States v. Spruill*, 808 F.3d 585, 605 (2d Cir. 2015) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" (Pooler, *J.*, dissenting) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993))).

11

U.S. at 182–83). There are compelling policy reasons behind such a rule. As Justice Scalia recognized, forfeiture is "not . . . mere[ly] [a] technicality," but rather "is essential to the orderly administration of justice." *Freytag*, 501 U.S. at 894–95 (Scalia, *J.*, concurring in part and concurring in the judgment) (quoting 9 C. Wright & A. Miller, Federal Practice and Procedure § 2472, p. 455 (1971)). At bottom, "[a]ny other rule would create a disincentive to raise Appointments Clause challenges with respect to questionable judicial appointments." *Ryder*, 515 U.S. at 183.

Gonnella has not shown this is one of those "rare cases" that would excuse his failure to object. We therefore hold – as have at least two other circuit courts that have considered the question – that a litigant who does not object to the constitutionality of an ALJ at any point during the SEC proceedings forfeits that challenge. *See Cooper v. SEC*, 788 F. App'x 474, 474–75 (9th Cir. 2019) ("The only issue [petitioner] raises in the opening brief is whether the ALJ was properly appointed under the Appointments Clause. However, because [petitioner] did not timely raise this issue before the Commission, he may not raise the issue on appeal."); *Malouf v. SEC*, 933 F.3d 1248, 1255 (10th Cir. 2019) ("[Petitioner] forfeited [his Appointments Clause challenge] by failing to present it in the SEC

12

proceedings."); *Kabani & Co. v. SEC*, 733 F. App'x 918, 919 (9th Cir. 2018) ("[P]etitioners forfeited their Appointments Clause claim by failing to raise it in their briefs or before the agency."), *cert. denied sub nom.*, 139 S. Ct. 2013 (2019); *see also David Stanley Consultants v. Dir., Office of Workers' Comp. Programs*, No. 18-3406, 2020 WL 504961, at *3 (3d Cir. Jan. 31, 2020) (relying on *Lucia* for the proposition that, in a Black Lung Benefits Act case, a petitioner who does not make a "timely" Appointments Clause challenge to the Benefits Review Board forfeits such a claim); *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013) (holding that a challenge to the composition of the National Labor Relations Board under the Recess Appointments Clause was not jurisdictional and could be forfeited if not raised to the Board).

Congress may, of course, excuse the failure to object in certain circumstances. In securities cases, Congress has generally provided that a failure to object under the Exchange Act or Investment Advisers Act (the "Advisers Act") may be excused in the event that there are "reasonable grounds" to do so, 15 U.S.C. §§ 78y(c)(1), 80b-13(a), although it has not created such an exception in the Securities Act, *see id.* § 77i(a). In any event, Gonnella points to no reasonable grounds that would excuse his failure to raise the objection below beyond the fact

that *Lucia* had not yet been decided. Gonnella does not deny that other litigants were raising Appointments Clause challenges to ALJs around the time he was litigating his case before the SEC. For example, Raymond Lucia, whose case would form the basis of the Supreme Court's *Lucia* decision, submitted his briefing to the Commission in 2014 and submitted supplemental briefing to the Commission on the Appointments Clause issue in July 2015. *See* Respondent's Supplemental Briefing in Support of Appeal, *In the Matter of Raymond J. Lucia Cos., et al.*, Admin Proc. File No. 3-15006 (2015) (Doc. No. 81). The Commission decided that case in September 2015 – almost a year prior to deciding Gonnella's case. *In the Matter of Raymond J. Lucia Cos., et al.*, Release No. 4190, 2015 WL 5172953 (Sept. 3, 2015). In fact, in June 2016, while Gonnella's case was pending before the SEC, this Court explicitly recognized the growing trend of raising claims regarding the constitutionality of ALJs. *See Tilton v. SEC*, 824 F.3d 276, 279–80 (2d Cir. 2016) ("During the past year or so, several respondents in ongoing SEC administrative proceedings have asserted that Article II of the United States Constitution bars the agency's ALJs from acting as hearing officers . . . [because they] were not appointed in accordance with the Appointments Clause."). Despite having constructive notice of the argument and relevant Supreme Court precedent –

14

which was ultimately heavily relied upon by the Supreme Court in *Lucia* – Gonnella failed to raise such a claim. *See Malouf*, 933 F.3d at 1258 ("In the SEC proceedings, Mr. Malouf could have invoked *Freytag*, just as the petitioners in *Bandimere* and *Lucia* had done."); *see also Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 257 (6th Cir. 2018) (highlighting that *Lucia* stated that *Freytag* established "everything necessary to decide this case," and ultimately finding forfeiture because appellants failed to raise the argument in their opening briefs (quoting *Lucia*, 138 S. Ct. at 2053)).

Gonnella nevertheless argues that it would have been futile to raise the argument to the Commission given the SEC's long history of using ALJs and its previously articulated position on the legality of that practice. Oral Argument at 1:26–2:03, *Gonnella v. SEC*, 16-3433 (2019), http://www.ca2.uscourts .gov/oral_arguments.html. But a pessimistic view of the Commission's likelihood of granting the motion is not enough to overcome the traditional rule mandating litigants to lodge their objections during the administrative proceedings. Indeed, Gonnella's futility argument is in tension with our decision in *Tilton*, in which we assessed the subject matter jurisdiction of a district court to consider an Appointments Clause challenge to the SEC's ALJs, and held that, "[b]y enacting

the SEC's comprehensive scheme of administrative and judicial review, Congress implicitly precluded federal district court jurisdiction over [an] appellant['s] constitutional [Appointments Clause] challenge" prior to review by an ALJ and the Commission. 824 F.3d at 279. We emphasized that "appellants will have access to meaningful judicial review of their Appointments Clause claim through administrative channels." *Id.* at 286. Although we made this assessment in the context of jurisdiction, the logic extends to forfeiture – the SEC had jurisdiction to hear the claim, and was in a position to provide meaningful review. It would thus not have been futile for Gonnella to raise the claim before the Commission.

In sum, Gonnella has not shown that this is "one of those rare cases" under *Freytag* that merits excusing forfeiture, and he has not shown reasonable grounds that would excuse his failure to object under the statutory scheme. Since Gonnella did not raise a constitutional argument to the ALJ or to the Commission, either in his initial briefs or via supplemental briefing prior to the Commission's final decision, he may not raise this objection now.

## B. The SEC's Cooperation Agreement with King Did Not Violate Gonnella's Right to Due Process

Gonnella next raises two challenges regarding the Enforcement Division's cooperation agreement with King. First, he insists that because the program

16

guidance under which the Enforcement Division signed up King as a cooperating witness did not go through the Notice and Comment procedures of the APA, his administrative hearing was tainted. Second, Gonnella contends that the Commission acted unconstitutionally as both the "prosecutorial and sentencing power" in implementing the program. Petitioner's Br. at 48. Neither argument is persuasive.

### 1. 17 C.F.R. § 202.12: Enforcement Guidance

Gonnella argues – for the first time on appeal – that the SEC's enforcement program constituted a rule change that should have gone through the APA's Notice and Comment process. As an initial matter, Gonnella forfeited this challenge. "No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1); *see MFS Sec. Corp. v. SEC*, 380 F.3d 611, 620–21 (2d Cir. 2004). Although Gonnella originally challenged the constitutionality of the enforcement program, discussed in further detail below, he never mounted a challenge to the legitimacy of 17 C.F.R. § 202.12 for failing to comply with the APA.

But even assuming that Gonnella has not forfeited this argument, we find that 17 C.F.R. § 202.12 is a policy statement, not a rule, and thus is not subject to

the Notice and Comment requirements of the APA. The APA's requirement that "[g]eneral notice of proposed rule making shall be published in the Federal Register" does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). As we have previously explained, policy statements generally impact agency behavior rather than change the "existing rights" of others outside the agency. *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) (internal quotation marks omitted). "The central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act." *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993). Such "legislative rules," which must go through Notice and Comment procedures, have "legal effect." *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000). To determine if a rule has "legal effect," we look to:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Id.* (quoting *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)).

Here, the first *Sheahan* factor is not even applicable, since the guidance contains no new rules for enforcement action. Moreover, although the Commission's enforcement guidance *was* published in the Code of Federal Regulations, it does not amount to an exercise of the agency's legislative authority since it merely promulgated a "policy statement" setting forth "the analytical framework employed by the Commission and its staff [to] . . . ensure[] that potential cooperation arrangements maximize the Commission's law enforcement interests." 17 C.F.R. § 202.12. The policy emphasizes that "the evaluation of cooperation requires a case-by-case analysis of the specific circumstances presented." *Id.* It is highly discretionary, non-binding, and does not impose any legal requirements on cooperating parties or the Commission. The document is a quintessential policy document that serves to increase transparency regarding the SEC's approach to cooperation. We therefore hold that the policy need not have gone through the Notice and Comment procedures of the APA.

### 2. The Commission as a "Prosecutorial Witness"

Gonnella further argues that the SEC's use of cooperators violated his right to due process because the cooperator's "sentence" is not imposed by a representative of the judiciary. He further argues that the agreement "incentivized

19

Mr. King to stretch the truth to please the same prosecutorial and sentencing power." Petitioner's Br. at 48.

But the cooperation agreement, entered into with the Enforcement Division, did nothing more than outline broad standards that the Commission may consider when looking at cooperation. The agreement itself stated it was entered "freely and voluntarily." App'x 991. It clearly stated that the Division "cannot, and does not, make any promise or representation as to whether or how the Commission may act on enforcement recommendations." *Id*. It further clarified that it was not binding, and the Commission could reject any recommendations it received. The use of cooperators does not violate due process simply because it takes place within the confines of the administrative state. We have never seriously questioned the premise that the SEC may use evidence and testimony garnered from a cooperating witness, and see no reason to do so now. *See, e.g., In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993) (noting the benefits of cooperating with the SEC).

As to Gonnella's claim regarding King's bias, there is no evidence to suggest that the agreement coerced King to testify any more than a cooperation agreement in any criminal case coerces a cooperating witness into testifying. Petitioner's

reliance on *United States v. Waterman*, 732 F.2d 1527 (8th Cir. 1984), is unpersuasive. Unlike in *Waterman*, Gonnella was not offered favorable treatment contingent upon the success of the prosecution. *Id.* at 1531. Moreover, during the public hearing Gonnella was able to cross-examine King to explore any biases he might have had. In light of the clear language of the agreement and the lack of any concrete evidence of bias, Gonnella's argument simply does not carry weight.

## C. The ALJ Did Not Engage in Impermissible Fact-Finding

Gonnella next argues that the Commission violated his right to due process by permitting the ALJ to create independent evidence and conduct independent fact-finding after the close of the evidence without providing Gonnella notice and an opportunity to be heard. In particular, Gonnella objects to the ALJs consideration of "obscure" law review articles in reaching its findings following the hearing. Petitioner's Br. at 37. But any error – and we are not convinced there was any – that may have occurred during the ALJ's adjudication was cured during the proceeding before the Commission. Not only did the Commission conduct *de novo* review of the facts and law, as statutorily required, but it explicitly stated that it did not rely on any of the articles to which Gonnella now objects.

**D. There Was Sufficient Evidence Supporting the Commission's Findings**

Finally, Gonnella makes two arguments regarding the sufficiency of the evidence at his disciplinary hearing. First, he argues that there was insufficient evidence to prove that he committed a primary violation of the securities laws. Second, Gonnella asserts that there was insufficient evidence to establish that he aided and abetted Barclays in a books and records violation. We disagree.

### 1. Primary Violation

Under Securities Act section 17(a), it is "unlawful for any person in the offer or sale of any securities," with scienter, "to employ any device, scheme, or artifice to defraud." 15 U.S.C. § 77q(a)(1). Under Exchange Act section 10(b) and Exchange Act Rule 10b-5, it is unlawful for "any person, directly or indirectly," with scienter, "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" Commission rules. *Id.* § 78j(b); 17 C.F.R. § 240.10b-5. In this context, severely "reckless conduct" is sufficient to constitute scienter. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978).

Even a cursory review of the record reveals substantial evidence that Gonnella intentionally engaged in deceitful behavior contrary to Barclays's policy in order to gain a personal benefit. Specifically, Gonnella acknowledged that he

was aware of Barclays's policy prohibiting trade parking, and admitted that he engaged in the trades to avoid the charges that would have been assessed to his book pursuant to Barclays's aged-inventory policy. The record is clear that Gonnella took steps to conceal his actions: he used vague, coded language in Bloomberg messages and did not disclose his agreement to repurchase the securities to either the compliance department or his direct supervisor, despite their growing suspicions. In addition, he did not properly record the trades in his trading book. Finally, there can be no doubt that Gonnella derived a personal benefit from his misconduct. Although he claims his actions did not impact his compensation, the record makes clear that as much as $950,000 of his annual compensation was from his bonus, and Gonnella himself admitted that he understood that having higher profits would increase the chances he would get a larger bonus. And while Gonnella ultimately reported the violation himself, the evidence established that he did so only when he knew that his supervisor was about to report him.

Although Gonnella makes much of the fact that Barclays represented that Gonnella did not violate the securities statutes when it reported his conduct to the SEC, Barclays's views on the law do not bind the Commission or this Court. Put

simply, Barclays concluded that Gonnella structured trades to avoid the aged-inventory policy and the charges that would have been assessed against his trade book. He then bought the securities back from King – at a higher price than he had previously sold them – at Barclays's expense. That is exactly what the Commission found, and the Commission determined that this behavior violated the securities laws. Taken together, the evidence was more than sufficient to show Gonnella's scienter.

Gonnella next argues that there was insufficient evidence to show that he actually committed fraud. As outlined above, claims under section 17(a) require proof of a "scheme . . . to defraud." 15 U.S.C. § 77q(a)(1). Similarly, claims under section 10(b) and Rule 10b-5 require proof of a "manipulative or deceptive device . . . in contravention of" Commission rules. *Id.* § 78j(b); 17 C.F.R. § 240.10b-5. In line with this, the Commission accurately found that Gonnella "acted deceptively by conveying a false appearance of compliance with Barclays's aged[-]inventory policy, thereby misleading Barclays about how long he had held a position in the relevant bonds and the degree of risk to the firm as a result of those trading positions." App'x 1066.

Here, the Commission found sufficient evidence that Gonnella sold securities to King for a temporary period of time, after which Gonnella repurchased those securities at a higher price. He did this to avoid $726,000 in irreversible aged-inventory charges, which would have negatively impacted his bonus. In doing so, Gonnella caused Barclays to pay $111,000 more to repurchase the securities at issue. In essence, he deceived Barclays into "paying a premium" for these securities. App'x 1067. In addition to costing Barclays money, Gonnella also increased the risk that Barclays faced in holding inaccurately valued securities. The aged-inventory policy was put in place to make sure that the trader's "valuation for a security reflected the prevailing market price at which he could buy and sell the security;" violating this policy "exposed Barclays to the risk of holding securities that [were] overvalued or undervalued." App'x 1067.

In the face of this clear evidence, Gonnella responds that (1) roundtrip trades were common in this marketplace, (2) he only violated an internal policy, and (3) there was no agreement to repurchase the securities. None of these arguments is compelling or constitutes a defense to his securities violations. As to his first point, the fact that behavior is common does not mean it is not fraud. *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir. 1998) (en banc) ("Even

a universal industry practice may still be fraudulent."); *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1171 (2d Cir. 1970). As to his second point, committing fraud and violating internal policy are not mutually exclusive. *See United States v. Naftalin*, 441 U.S. 768, 770 (1979) (federal securities laws "prohibit[] frauds against brokers as well as investors"). Finally, as to his third point, there was more than sufficient evidence to demonstrate Gonnella's intent to repurchase the securities. As explained in greater detail above, Gonnella organized the transactions with King, who had no experience with this type of trade, and led King to believe he would buy them back, which he in fact did, at a premium. In short, the Commission was completely justified in concluding that Gonnella intentionally violated the securities laws.

## 2. Aiding and Abetting

Gonnella similarly argues that the Commission's findings were insufficient to establish that he aided and abetted his employer's violations of the books and records provisions of section 17(a) and Rule 17a-3(a)(2), the latter of which requires that registered broker-dealers "make and keep current . . . [l]edgers (or other records) reflecting all assets and liabilities, income and expense and capital accounts." 17 C.F.R. § 240.17a-3(a)(2). "In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: (1) the

26

existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (internal quotation marks omitted).

As the Commission found, Barclays violated Exchange Act section 17(a) and Rule 17a3(a)(2) by "maintain[ing] books and records that did not reflect Gonnella's agreement with King." App'x 1071. Gonnella documented his trades without indicating that there was an agreement to repurchase the bonds, and thus made the books inaccurate. Gonnella's only defense is that he did not engage in stock-parking or prearranged trades. But, as stated above, there was more than enough circumstantial evidence for the Commission to find that Gonnella did just that. This argument, like the others, therefore fails.

### E. The Commission Did Not Improperly Sanction Gonnella

Finally, Gonnella argues that the Commission violated due process when it imposed higher sanctions than the ALJ had originally imposed. The securities regulations make clear that if a party files a timely petition for review "or if the Commission on its own initiative orders review of a decision . . . the initial decision shall not become final as to that party or person." 17 C.F.R. § 201.360(d)(1).

27

Moreover, the Commission "may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, an initial decision by a hearing officer and may make any findings or conclusions that in its judgment are proper and on the basis of the record." *Id.* § 201.411(a); *see also Checkosky v. SEC*, 23 F.3d 452, 461 (D.C. Cir. 1994) ("Since the Commission (not the ALJ) is charged with the responsibility to suspend petitioners, the initial decision of the ALJ is of limited consequence.").

Under Exchange Act section 15(b)(6) and Advisers Act section 203(f), the Commission can suspend a defendant for up to 12 months or can bar him "from being associated with a broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization" if the Commission determines the defendant's acts were willful violations of the securities laws and such a bar would serve the public interest. 15 U.S.C. §§ 78o(b)(6)(A), 80b-3(f). Further, the Investment Company Act allows the Commission to "prohibit, conditionally or unconditionally, either permanently or for such period of time as it in its discretion shall deem appropriate in the public interest," any person from serving in certain capacities with respect to an investment company so long as the securities violation was willful, and the ban is in the public interest. *Id.* § 80a-9(b).

Here, both Gonnella and the Enforcement Division petitioned the Commission for review. In its petition for review, the Enforcement Division argued that the length of time that the ALJ imposed as a penalty was "inadequate in light of the [administrative] law judge's findings concerning the extent of Gonnella's misconduct." App'x 1035. The Division requested that the Commission "impose permanent collateral and penny-stock bars on Gonnella or, in the alternative, impose bars of sufficient length to effectuate their remedial purpose and protect the public interest." App'x 1037.

As the Commission noted, its review, including review of sanctions, is *de novo*. App'x 1076 (citing *In re Gary M. Kornman*, Exchange Act Release No. 2840, 2009 WL 367635, at *9 n.44 (Feb. 13, 2009)). And while the Enforcement Division did not specifically request that the Commission bar Gonnella from serving in certain positions under the Investment Company Act, the Commission nonetheless found such sanctions were warranted. The Commission noted that the order instituting proceedings against Gonnella specifically sought relief under the Investment Company Act section 9(b), 15 U.S.C. § 80a-9(b), which authorizes a lifetime ban. App'x 1073 n.52; App'x 3. Moreover, the Commission found that Gonnella's fraud was "egregious[]," S. App'x 82, and that because Gonnella still

did not grasp the seriousness of his actions, he was likely to commit additional offenses. Over the dissent of Commissioner Piwowar, the majority of the Commissioners found a life ban with the possibility of reapplication in five years to be appropriate.

The SEC's ability to increase penalties flows logically from the statutory scheme – its review is *de novo*, and the ALJ's decision is not final. Despite Gonnella's claims that the punishment is "draconian," *see* Petitioner's Reply Br. at 49–50, the Court must "not disturb the SEC's choice of sanction unless it is unwarranted in law or without justification in fact," *Mathis*, 671 F.3d at 216 (internal quotation marks omitted). Here, we have no reason to doubt that the sanctions imposed by the Commission were both warranted by law and justified in fact. Accordingly, we find no basis for disturbing the Commission's order.

## CONCLUSION

For the reasons stated above, the petition for review is **DENIED** and the decision of the Commission is **AFFIRMED** in its entirety.